Joe E. WALKER, Jr., d/b/a Last Chance Lounge, Appellant,

v.

CITY OF KANSAS CITY, MISSOURI; Richard L. Berkley, Mayor of Kansas City, Missouri; The City Council of Kansas City, Missouri; Chuck Weber; Sally Johnson; Frank Palermo; Robert M. Hernandez; Joanne M. Collins; Charles A. Hazley; Dan Cofran; Kathryn Shields; Emanuel Cleaver; Mark Bryant; John A. Sharp, Appellees.

Joe E. WALKER, Jr., d/b/a Last Chance Lounge, Appellee,

v.

CITY OF KANSAS CITY, MISSOURI; Richard L. Berkley, Mayor of Kansas City, Missouri; The City Council of Kansas City, Missouri; Chuck Weber; Sally Johnson; Frank Palermo; Robert M. Hernandez; Joanne M. Collins; Charles A. Hazley; Dan Cofran; Kathryn Shields; Emanuel Cleaver; Mark Bryant; John A. Sharp, Appellants.

Nos. 89–1001, 89–1057.

United States Court of Appeals, Eighth Circuit.

Submitted June 16, 1989.

Decided Aug. 7, 1990.

Errol Copilevitz, Kansas City, Mo., for appellant.

Dan G. Jackson, III, Kansas City, Mo., for appellees.

Before LAY, Chief Judge, BOWMAN, Circuit Judge, and DUMBAULD,* Senior District Judge.

BOWMAN, Circuit Judge.

In June 1985, appellant Joe E. Walker, Jr., submitted a rezoning application to the Kansas City Plan Commission requesting that his property be granted a District C–X zoning classification, which would permit him to display go-go girls in his drinking establishment, the Last Chance Lounge. The Commission recommended approval of the zoning change, which permitted Walker's application to be forwarded to the City Council for consideration. Kansas City, Mo., Zoning Ordinance

* The HONORABLE EDWARD DUMBAULD, Senior United States District Judge for the Western District of Pennsylvania, sitting by designation.

§ 39.360(I) (1987). The Plans and Zoning Committee of the City Council held a series of hearings on the application, but over a year passed without a decision. Shortly before the City Council denied his application, Walker brought suit under 42 U.S.C. § 1983 against Kansas City and its Mayor and Council members alleging that they had violated his constitutional rights to free speech and due process and that the defendants had conspired to deprive him of his civil rights. He sought both an injunction and damages. After a hearing on Walker's motion for a preliminary injunction, which was converted into a trial on the merits of the case, the District Court found no due process violation, but held that the zoning ordinance violated Walker's First Amendment rights. *Walker v. City of Kansas City, Mo.* (*Walker I*), 691 F.Supp. 1243 (W.D.Mo.1988). Following hearings on the scope of relief, the court enjoined the city from enforcing the ordinance against Walker and, rejecting Walker's argument for compensatory damages, awarded nominal damages. *Walker v. City of Kansas City, Mo.* (*Walker II*), 697 F.Supp. 1088 (W.D.Mo.1988). The court also awarded attorney fees to Walker. On appeal, Walker contests the trial court's dismissal of the individual City Council members, rejection of his due process claim, limitation of damages to nominal rather than compensatory, and denial of his motion for a new trial on the compensatory damages issue. The city cross-appeals the court's First Amendment holding and the award of nominal damages and attorney fees. We reverse the judgment for Walker on his First Amendment claim and vacate the injunction and the award of nominal damages and attorney fees. In all other respects, we affirm.[1]

## I.

Section 39.156(II) of the Kansas City Zoning Ordinance requires that a District C–X classification be approved by the City Council antecedent to the establishment of a variety of sex-related businesses,[2] including that which Walker intended to institute in the Last Chance Lounge—"exotic dancing." An "exotic dance facility" is defined in the ordinance as

Any building, structure or facility which contains, or is used for commercial entertainment, where the patron directly or indirectly is charged a fee to observe "specified anatomical areas," provided that the genitals and pubic area of all persons and the areola and nipple of the breasts of all female persons are opaquely covered.

"Specified anatomical areas" entail:

1. Less than completely or opaquely covered:
 (a) Human genitals, pubic region,
 (b) Buttocks,
 (c) Female breast area below a point immediately above the top of the areola.
2. Human male genitals in a discernibly turgid state even if completely and opaquely covered.

Kansas City, Mo., Zoning Ordinance § 39.156(I)(I) & (P).

The particular brand of exotic dancing we deal with here—it was stressed by John Frankum, the attorney representing Walker during the Council hearings[3]—is go-go dancing. Frankum objected to the deroga-

---

**1.** In the proceedings in the District Court Walker occasionally alluded to his claim of a conspiracy among the council members to deny his constitutional rights. He did not develop this claim, however, and the court did not address it. Walker raises no issue on appeal with respect to this claim. We take it to have been abandoned. In any event, it appears to be devoid of substance.

**2.** Section 39.156 concerns "[a]dult book stores, adult entertainment facilities, adult theaters, bath houses, massage shops, modeling studios and artists-body painting studios, and exotic

dance facilities." Kansas City, Mo., Zoning Ordinance § 39.156(II) (1987). At least some of these enterprises involve activities unrelated to speech and therefore are wholly without First Amendment protection. *See FW/PBS, Inc. v. City of Dallas*, — U.S. —, 110 S.Ct. 596, 604, 107 L.Ed.2d 603 (1990).

**3.** These hearings were before a subgroup of the City Council, the Plans and Zoning Committee, which ordinarily makes a recommendation to the full Council before that body decides to approve or deny an application for rezoning.

tory connotation implicit in the term "exotic dancers," claiming that the expression was misleading. The sort of person who is interested in go-go dancers, he explained, would not necessarily be "something less than someone who would want to watch the Kansas City Symphony." Amending ch. 65, Rev. Ordinances of Kansas City, Mo., 1956: Summary of Hearings on § 65.010A1952, Plans and Zoning Committee [hereinafter Zoning Committee Hearings] (May 7, 1987) (paraphrased statements of John Frankum). However characterized, Walker planned for his go-go girls to dance, for the pleasure of the customers of his bar, attired in bikini bottoms and "pasties," *i.e.*, adhesive material covering only the areolas of the girls' breasts. The girls would be permitted by Walker, however, to cover more of their breasts, as they preferred. *Id.* (statements of John Frankum). In any event, the sort of entertainment Walker hoped to provide at his establishment is undoubtedly covered by section 39.156 of the Kansas City zoning ordinance, and Walker does not argue to the contrary.

Because the Last Chance Lounge is located within one thousand feet of a residential district, Walker was not eligible for a District C–X classification for that property unless he could obtain the signatures of a simple majority of the residents and property owners within a radius of one thousand feet. There is no time limit to acquiring the signatures and so, ten months after filing his application, Walker presented the City Plan Commission with a waiver petition containing the names of nineteen of the thirty-seven residents located near his lounge.[4] That same day, in April 1986, the Commission approved the waiver and recommended approval of the

application, which was forwarded to the City Council.[5]

The Plans and Zoning Committee of the City Council discussed Walker's application at length during a series of meetings held at intervals throughout the ensuing period of approximately twenty months. Presentations by citizens opposed to the rezoning classification consumed the bulk of the hearings; indeed, except for the remarks of Council members and Walker's attorneys, discussion at the meetings consisted entirely of the protestations of private citizens in opposition to the rezoning. In all, roughly forty to fifty people spoke against the zoning change.[6] Zoning Committee Hearings (May 28, 1987). Eventually the matter reached the full Council (without a recommendation from the committee), and on December 17, 1987, the Council voted to reject the application.

In October 1987, approximately two months before the Council's vote, Walker brought this lawsuit alleging that the zoning ordinance violated his free speech and due process rights under the First, Fifth, and Fourteenth Amendments of the United States Constitution. In December he moved for a temporary restraining order and a preliminary injunction. Failing to pursue this motion, Walker filed a renewed motion for a preliminary injunction some weeks later. In the interim the city and the Council members—whom Walker had sued in their individual capacities—filed a motion to dismiss, which the District Court granted as to the individual Council members. Subsequent to the hearing on the preliminary injunction, the parties agreed to treat that hearing as a trial on the merits and thus submitted post-trial briefs. In addition to the testimony adduced at the

---

4. Shortly thereafter one of the nineteen attempted to retract his consent, which would, of course, have defeated Walker's eligibility to apply for District C–X zoning. The City Plan Commission, however, would not permit a retraction.

5. Although neither party comments upon this, the Commission's virtually instantaneous approval of Walker's application was apparently in violation of the Zoning Ordinance, which requires—prior to the issuance of a recommen-

dation—"due public notice and hearings, at which parties in interest and citizens shall have an opportunity to be heard." Kansas City, Mo., Zoning Ordinance § 39.360(I) (1987).

6. In addition, at one of the hearings "about 30" members of the audience stood when a speaker asked all those opposed to the rezoning to stand. At least two lists containing signatures of others in opposition were submitted to the Committee. Zoning Committee Hearings (May 14, 1987).

hearing, the court received reams of city documents and videotapes of various City Council meetings. In June 1988, the District Court issued its memorandum opinion and order in which the court rejected Walker's due process claims but found a violation of his First Amendment rights. *Walker I*, 691 F.Supp. 1243 (W.D.Mo.1988). After additional hearings, the court entered an injunction prohibiting the city from enforcing the ordinance against Walker and awarded Walker nominal damages, but denied compensatory damages, finding that the evidence was insufficient to establish the amount of such damages with reasonable certainty. *Walker II*, 697 F.Supp. 1088 (W.D.Mo.1988). The parties subsequently stipulated to the award of attorney fees and the court entered an order approving the stipulation on November 22, 1988.

We affirm the District Court's denial of Walker's due process claims but reverse its judgment for Walker on his First Amendment claim. Accordingly, we vacate the injunction and the award of nominal damages and attorney fees. Our decision moots Walker's claim against the City Council members in their individual capacities and his claim for compensatory damages.

## II.

Walker asserts that the entertainment he proposed to introduce at the Last Chance Lounge—pasty-clad dancing girls—constitutes "speech" within the meaning of the First Amendment. "[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 3069 n. 5, 82 L.Ed.2d 221 (1984). Although the burden is thus his, Walker cites only the dictum from one Supreme Court case suggesting that nude dancing is protected speech while ignoring no small amount of dicta—as well as actual holdings—from other cases indicating the contrary.

The statement upon which Walker rests the entire force of his claim that semi-nude dancing girls constitute protected speech is taken from *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), a case involving a statute that prohibited *all* live entertainment within Mount Ephraim: "no property in the Borough may be principally used for the commercial production of plays, concerts, musicals, dance, or any other form of live entertainment." 452 U.S. at 66, 101 S.Ct. at 2181. The live entertainment appellants in that case proposed to introduce to the city of Mount Ephraim was, in fact, nude dancing. But the Court invalidated the ordinance on overbreadth grounds alone: "Whatever First Amendment protection should be extended to nude dancing, live or on film, however, the Mount Ephraim ordinance prohibits all live entertainment in the Borough...." *Id.* Consequently, the Court's statement that "nude dancing is not without its First Amendment protections," 452 U.S. at 66, 101 S.Ct. at 2181, is unadulterated dicta—and dicta quite wide of the holding. Indeed the author of that very statement, Justice White, has subsequently explicitly stated that the Court has never decided whether nude dancing is entitled to any First Amendment protection. *Young v. Arkansas*, 474 U.S. 1070, 1072, 106 S.Ct. 830, 832 (1986) (White, J., dissenting from denial of certiorari); *see also New York State Liquor Auth. v. Bellanca*, 452 U.S. 714, 718–19, 101 S.Ct. 2599, 2601–02, 69 L.Ed.2d 357 (1981) (Stevens, J., dissenting).

Were there no other statements from Supreme Court opinions relevant to the First Amendment status of nude or semi-nude dancing, this dictum would merit some deference. There have, however, been many such emanations from the Court relevant to this question, and examples of these that seem to confute Walker's bald assertion are not wanting. Thus, for example, the Court has stated: "[N]udity may not be exploited without limit by films or pictures exhibited or sold in places of public accommodation any more than live ... nudity can be exhibited or sold without limit in such public places." *Miller v. California*, 413 U.S. 15, 25–26, 93 S.Ct. 2607, 2615–16, 37 L.Ed.2d 419 (1973). Appended

as a footnote to that statement is this one: "Although we are not presented here with the problem of regulating lewd public conduct itself, the States have greater power to regulate nonverbal, physical conduct than to suppress depictions or descriptions of the same behavior." 413 U.S. at 26 n. 8, 93 S.Ct. at 2616 n. 8. In *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973), the Court stated:

> Conduct or depictions of conduct that the state police power can prohibit on a public street do not become automatically protected by the Constitution merely because the conduct is moved to a bar or a "live" theater stage, any more than a "live" performance of a man and woman locked in a sexual embrace at high noon in Times Square is protected by the Constitution because they simultaneously engage in a valid political dialogue.

413 U.S. at 67, 93 S.Ct. at 2640. And again in *California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), the majority opinion noted: "[A]s the mode of expression moves from the printed page to the commission of public acts that may themselves violate valid penal statutes, the scope of permissible state regulations significantly increases." 409 U.S. at 117, 93 S.Ct. at 396.

Even Justice Douglas—famous for his dissents in many First Amendment cases (including each of the cases quoted above) in which he asserted that any number of pornographic items constituted protected speech [7]—apparently would have drawn the line at "exotic" dancing. Thus, he wrote: "I assume there is nothing in the Constitution which forbids Congress from ... proscrib[ing] *conduct* on the grounds of good morals. *No one would suggest that the First Amendment permits nudity in public places....*" *Roth v. United States*, 354 U.S. 476, 512, 77 S.Ct. 1304, 1323, 1 L.Ed.2d 1498 (1957) (Douglas, J., dissenting) (emphasis added to second sentence). In a later case—and later dissent—Justice Douglas noted the historical roots of the distinction he drew between sexually explicit—indeed obscene—literature and actual people shedding their clothes in public places:

> The first reported case involving obscene conduct was not until 1663. There, the defendant was fined for "shewing himself naked in a balkony, and throwing down bottles (pist in) vi & armis among the people in Convent Garden, contra pacem, and to the scandal of the Government." *Sir Charles Sydlyes Case*, 83 Eng.Rep. 1146–1147 (K.B.1663). Rather than being a fountainhead for a body of law proscribing obscene literature, later courts viewed this case simply as an instance of assault, criminal breach of the peace, or indecent exposure. *E.g., Bradlaugh v. Queen*, L.R. 3 Q.B. 569, 634 (1878); *Rex v. Curl*, 93 Eng.Rep. 849, 851 (K.B.1727) (Fortescue, J., dissenting).

*United States v. 12 200–Ft. Reels of Super 8 mm. Film*, 413 U.S. 123, 134, 93 S.Ct. 2665, 2672, 37 L.Ed.2d 500 (1973) (Douglas, J., dissenting). If there is a distinction between Sir Charles's disrobing and the go-go girls' performance at the Last Chance Lounge, it at least cannot be said that that distinction lies in the lack of expressiveness of Sir Charles's conduct.

That some lower courts have found nude dancing to be protected speech, thus entering territory that even the First Amendment "absolutist" Justice Douglas considered beyond the pale, calls to mind the

---

7. Interestingly, though, Justice Douglas dissented in *Larue* only because the California regulations challenged in that case—which prohibited live sexual entertainment in bars—had not yet been enforced against anyone. He explicitly accepted the majority's discussion of the First Amendment status of nude dancing, 409 U.S. at 116–18, 93 S.Ct. at 395–97, even though the Court's holding was not based exclusively on its finding that the performances at issue more closely resembled conduct than expression. Thus, Justice Douglas wrote:

> The line which the Court draws between "expression" and "conduct" is generally accurate; and it also accurately describes in general the reach of the police power of a State when "expression" and "conduct" are closely brigaded. But we still do not know how broadly or narrowly these rules will be applied.

409 U.S. at 121, 93 S.Ct. at 398 (Douglas, J., dissenting).

cautionary dictate periodically invoked by the Court regarding the tendency of "[a]ll rights ... to declare themselves absolute to their logical extreme." *Hudson County Water Co. v. McCarter*, 209 U.S. 349, 355, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908) (Holmes, J.).

> The seductive plausibility of single steps in a chain of evolutionary development of a legal rule is often not perceived until a third, fourth, or fifth "logical" extension occurs. Each step, when taken, appeared a reasonable step in relation to that which preceded it, although the aggregate or end result is one that would never have been seriously considered in the first instance. This kind of gestative propensity calls for the "line drawing" familiar in the judicial, as in the legislative process: "thus far but not beyond."

*12 200–Ft. Reels*, 413 U.S. at 127, 93 S.Ct. at 2668 (citations omitted). The indicators that an "end result ... that would never have been seriously considered in the first instance" may be reached when the performances of "go-go girls" are accorded First Amendment protection include not only the rather clear statements to the contrary in various Supreme Court opinions, but also the clash such a result produces with other constitutional principles. Like all other rights, the right to express oneself freely is "limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached." *Hudson County Water Co.*, 209 U.S. at 355, 28 S.Ct. at 531 (Holmes, J.). When "expression" takes the form of go-go dancing, it may be that those other principles are ascendant.

One of the neighboring principles with which "go-go" dancing as protected speech must inevitably collide is that which holds obscene speech unprotected by the First Amendment. Obscenity is defined as material that " 'the average person, applying contemporary community standards' would find ... taken as a whole, appeals to the prurient interest; ... depicts or describes, in a patently offensive way, sexual conduct specifically defined by applicable state law, and ... taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller v. California*, 413 U.S. at 24, 93 S.Ct. at 2615 (citations omitted). Scantily clad barroom dancing girls are unlikely to find safe haven in the final two criteria of the obscenity test: an informal catalogue of only those attempts by cities to regulate or prohibit such conduct that reach the courts establishes beyond cavil that entertainment such as that in the Last Chance Lounge is commonly deemed offensive and degrading,[8] and "[p]ublic nudity is ... prohibited in every state." *Miller v. Civil City of South Bend*, 904 F.2d 1081, 1132 (7th Cir.1990) (en banc) (Manion, J., dissenting). Moreover, even those who would hold such conduct protected speech make no pretension that near-naked girls jiggling for the titillation of the boozing clientele at a bar have any "serious literary, artistic, political, or scientific value." [9] If such behavior is to escape the obscenity guillotine, therefore, it must not define its expressive quality as an appeal to the prurient interest. This presents something of a conundrum for those who would describe such behavior as protected speech. To the extent that nude barroom dancing contains a message and therefore qualifies as First Amendment "speech," it may contain a message that nonetheless is categorically unprotected by the First Amendment—that is, an appeal to the prurient interest.

In one of the most expert linguistic navigations imaginable between the Scylla of "nonexpression" and Charybdis of "expression appealing to the prurient interest," one court has described the communicative

---

**8.** *See Paris Adult Theatre*, 413 U.S. at 63, 93 S.Ct. at 2638 ("The sum of experience, including that of the past two decades, affords an ample basis for legislatures to conclude that a sensitive, key relationship of human existence, central to family life, community welfare, and the development of human personality, can be debased and distorted by crass commercial exploitation of sex.").

**9.** *See generally* the majority opinion and two concurrences in the highly divided Seventh Circuit en banc case, *Miller v. Civil City of South Bend*, 904 F.2d 1081 (7th Cir.1990).

value of such dancing thus: "The dominant theme communicated here by the [nude female] dancers is an emotional one; it is one of eroticism and sensuality [—t]hough this dance is clearly of inferior artistic and aesthetic quality as contrasted with a classic ballet...." *Miller v. Civil City of South Bend,* 904 F.2d at 1086–87 (footnote omitted) (holding that nude dancing is protected speech). The concurrences in that case openly acknowledge the prurient appeal of nude dancing in their accounts of the "expression" implicit in such dancing. One judge writes:

> It seems to me beyond doubt that a barroom striptease is "expressive." Even if relatively restrained, as are the videos in evidence here, a striptease sends an unadorned message to a male audience. It is a message of temptation and allurement coupled with coy hints at satisfaction. In a real barroom, messages would probably also flow in the opposite direction, in the form of encouraging comments to the performer from the patrons. *E.g.* "Take it off; take it off!"

*Miller,* 904 F.2d at 1089 & n. 1 (Cudahy, J., concurring). The other concurrence in that case goes beyond flirtation with the obscenity standard by describing the message sent by barroom dancing girls as being explicitly grounded in prurience:

> Erotic dances express erotic emotions, such as sexual excitement and longing. Nudity is the usual state in which sexual intercourse is conducted in our culture, and disrobing is preliminary to nudity. But of course nudity and disrobing are not invariably associated with sex. The goal of the striptease—a goal to which the dancing is indispensable—is to enforce the association: to make plain that the performer is not removing her clothes because she is about to take a bath or change into another set of clothes or undergo a medical examination; to insinuate that she is removing them because she is preparing for, thinking about, and desiring sex. The dance

ends when the preparations are complete. The sequel is left to the viewer's imagination. This is the "tease" in "striptease."

\* \* \* \* \* \*

> Of course, there would be no female stripteases without a prurient interest in the female body....

*Miller,* 904 F.2d at 1091 (Posner, J., concurring). If the message communicated by such barroom dancers is primarily one of prurience, that communication is not entitled to First Amendment protection.

A peril even more difficult of circumnavigation than the potentially unprotected status of the message being communicated by Walker's "go-go" girls is the Supreme Court's recent holding that ballroom dancing does not constitute protected expression. In *City of Dallas v. Stanglin,* 490 U.S. 19, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989), the owner of a ballroom dance hall charged that a local ordinance limiting the use of dance halls to teenagers between the ages of fourteen and eighteen violated his patrons' "right of association." The Court described the two separate routes to protected freedom of association as entailing either an association involving "certain intimate human relationships" or an association formed "for the purpose of engaging in those activities protected by the First Amendment." 109 S.Ct. at 1594 (quoting *Roberts v. United States Jaycees,* 468 U.S. 609, 617–18, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984)). After rejecting the first of these as a plausible characterization of ballroom dancing,[10] the Court went on to consider whether the ballroom dancers "were engaged in a form of expressive activity ... protected by the First Amendment." 109 S.Ct. at 1595. Expressive activity of the sort that activates First Amendment protections, the Court held, ballroom dancing is not. Importantly, however, the Court did find that ballroom dancing was "associational," holding only that

---

10. *Stanglin,* 109 S.Ct. at 1595 ("It is clear beyond cavil that dance-hall patrons ... are not engaged in the sort of 'intimate human relationships' [protected by the freedom of association].")

that association was simply not expressive. 109 S.Ct. at 1595.

The right of expressive association has been considered a necessary adjunct to the rights secured by the First Amendment:

> An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed.... Consequently, we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

*Roberts v. United States Jaycees*, 468 U.S. 609, 622, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984) (citations omitted). Because the right of expressive association is derived from those rights mentioned in the First Amendment, all that need be shown to establish the existence of such a right is, first, that a group of people have come together, and, second, that they have come together for the purpose of engaging in some activity protected by the First Amendment:

> What the Court *has* recognized as implicit in the first amendment, and therefore in the liberty secured by the fourteenth, is *a right to join with others to pursue goals independently protected by the first amendment*
>
> . . . .
>
> [Our Constitution] has at least protected the concerted pursuit of ends that would represent fundamental rights *in the context of purely individual activity.*

L. Tribe, American Constitutional Law 702–03 (1978) (emphasis added to second sentence). Assuming an association is found, therefore, any activity that would merit First Amendment protection if engaged in outside the context of the association will suffice to constitute a right of association.[11]

In *Stanglin* the Court did find that the activities at the dance-hall were associational "in common parlance" but found that they were not expressive—"they simply do not involve the sort of expressive association that the First Amendment has been held to protect." 109 S.Ct. at 1595. Thus, although the respondent in *Stanglin* fashioned his argument as a right of association claim, the Court's statement that "this activity [does not] qualif[y] ... as a form of 'expressive association,'" 109 S.Ct. at 1595, combined with the Court's finding that ballroom dancing in respondent's dance-hall was associational, establishes that ballroom dancing by itself is not protected speech.

While the precise sort of dancing at issue in *Stanglin* was ballroom rather than "go-go" dancing, it turns the Supreme Court's First Amendment rulings on their heads to maintain that an activity unprotected by the First Amendment when the participants are clothed acquires exalted status under that amendment if the participants shed their clothes. *See, e.g., Young v. American Mini Theatres*, 427 U.S. 50, 61, 96 S.Ct. 2440, 2447–48, 49 L.Ed.2d 310 (1976) ("[T]here is surely a less vital interest in the uninhibited exhibition of material that is on the borderline between pornography and artistic expression...."). Indeed, as Judge Easterbrook has noted:

> A line that distinguishes barroom dancing (protected) from ballroom dancing (unprotected) has little virtue other than avoiding inconvenient precedent such as *Stanglin*. If the "expression" in barroom dancing lies, as my colleagues believe, maj. at 1086–87, in a celebration of sex, conveying the pleasure dancers take in sensuality, social dancing is the more expressive. Barroom dancers feign emotion; ballroom dancers express the real thing. So if precedent is what drives our court today, the most powerful case is *Stanglin*, which undermines the majori-

---

11. Of course, the right of association is no more absolute than the right of free speech or any other right; consequently there may be countervailing principles that prevail over the right of association. *Compare United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968), *with Roberts*, 468 U.S. at 623, 104 S.Ct. at 3252–53.

**90**

ty's conclusion [that barroom dancing is protected speech].

*Miller v. Civil City of South Bend,* 904 F.2d at 1129 (Easterbrook, J., dissenting).

Whether *Stanglin* preempts our consideration of the First Amendment status of "go-go" girls, and whether the gyrations of "go-go" girls at the Last Chance Lounge can be described as an appeal to either the intellect or those emotions not grounded in prurience, *see generally Ward v. Rock Against Racism,* — U.S. ——, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (noting the capacity of music to "appeal to the intellect and to the emotions," in holding that music "as a form of expression and communication" is protected speech), we do not decide today. Walker has suggested no theory under which we could find his go-go girls expressive of something protected by the First Amendment. Rather he states simply that "it has been held by the United States Supreme Court that nude dancing is entitled to some First Amendment protection." Appellant's Brief at 29. As we have noted above—and members of

the Supreme Court have noted in *Young v. Arkansas,* 474 U.S. at 1072, 106 S.Ct. at 832, and *Bellanca,* 452 U.S. at 718–19, 101 S.Ct. at 2601–02—the Supreme Court has held no such thing. We raise the specter of an obscenity determination and of the *Stanglin* precedent only to point out some of the land mines that await proponents of the view that go-go girls communicate constitutionally protected expression.[12]

### III.

■ Although we do not decide the question whether the Founding Fathers had "exotic dancing" in mind when they penned the First Amendment, our decision need not rest on a holding that go-go dancing is not protected speech, for Walker intended to establish such dancing in a bar. This zoning ordinance "come[s] to us, not in the context of censoring a dramatic performance in a theater," but rather in a context of regulating the activities that may be conducted at the Last Chance Lounge, a bar licensed to sell liquor by the drink.[13] *California v. LaRue,* 409 U.S.

---

**12.** The dissent correctly points out that our comments on the doubtful standing of go-go dancing as First Amendment speech are dicta. In addition, the dissent asserts that they are "clearly wrong." We note only that the dissent's argument rests *exclusively* on dicta from *Schad.* It would seem that the three reasons offered by the dissent for finding our discussion of the First Amendment status of nude dancing "clearly wrong" are merely three restatements of a general argument that the dicta in *Schad* should be controlling. Indeed, the lower court cases cited in the dissent for the proposition that nude dancing is protected speech all rely on the dicta in *Schad.* We also note that, contrary to the view expressed in the dissent, the First Amendment status of Walker's go-go girls is properly before us in this case. The Kansas City ordinance was struck down by the District Court on only one ground: Walker's putative right under the First Amendment to display go-go girls. The city cross-appeals that determination. That the city relied only on its authority under the police power to zone businesses dealing in "adult" material—some of which may or may not be entitled to First Amendment protection— does not constitute an abandonment of the First Amendment issue. We do not rest our decision in this case on the First Amendment because we do not need to: the Twenty-first Amendment compels the result, thus preempting the First Amendment issue. Finally, we categorically reject the suggestion in footnote 6 of the dissent

that our view of the applicability of the First Amendment turns on "a personal distaste for Walker's go-go dancing." *Post* at 99 n. 6. This is simply not true. While no judicial opinion can hope to be value free, nor should it be, we think the pertinent values are those found in the text of the First Amendment, and it is by those values (as well as by the relevant decisions of the Supreme Court) that our discussion of this issue has been guided.

**13.** From the inception of this litigation Walker has claimed that the zoning ordinance violates the First Amendment only as the ordinance applies to him. Whether the ordinance could be construed to violate the First Amendment rights of anyone else—prospective proprietors of "go-go" dance facilities that are not licensed to dispense liquor by the drink, for example—therefore is not before us. Nonetheless, we cannot help observing that the great leeway the Supreme Court has accorded local governments in their attempts to deal with the secondary effects of so called "adult" establishments suffices to shield this ordinance from a facial attack in any event. In *City of Renton v. Playtime Theatres,* the Supreme Court stated, "[A] majority of this Court decided that, at least with respect to businesses that purvey sexually explicit materials, zoning ordinances designed to combat the undesirable secondary effects of such businesses are to be reviewed under the standards applicable

109, 114, 93 S.Ct. 390, 395, 34 L.Ed.2d 342 (1972).

 States have authority under the Twenty-first Amendment to impose an almost limitless variety of restrictions on drinking establishments such as the Last Chance Lounge.[14]

The Twenty-first Amendment grants the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system. Although States retain substantial discretion to establish other liquor regulations, those controls may be subject to the federal commerce power in appropriate situations. The competing state and federal interests can be reconciled only after careful scrutiny of those concerns in a "concrete case."

*California Retail Liquor Dealers Ass'n. v. Midcal Aluminum,* 445 U.S. 97, 110, 100 S.Ct. 937, 945–46, 63 L.Ed.2d 233 (1980). Faced with "concrete case[s]" remarkably similar to the present one, the Supreme Court has deferred to the State's power to regulate.

Thus, for example, in *California v. La-Rue,* the Court sustained California liquor regulations that prohibited, among other things, the exposure of any portion of a person's genitals or anus, whether live or depicted in films or pictures, in any establishment licensed to sell liquor by the drink. 409 U.S. 109, 111–12, 118–19, 93 S.Ct. 390, 393–94, 397–98, 34 L.Ed.2d 342 (1972). Although the California regulations concerned slightly more explicit displays of human body parts than those that call the Kansas City zoning ordinance into play [15]—go-go girls in Kansas City must at least cover their genitals and areolas—the *LaRue* Court's reasoning extends well beyond the facts of that case. The Court explained:

While the States, vested as they are with general police power, require no specific grant of authority in the Federal Constitution to legislate with respect to matters traditionally within the scope of the police power, the broad sweep of the Twenty-first Amendment has been recognized as conferring something more than the normal state authority over public health, welfare, and morals.

409 U.S. at 114, 93 S.Ct. at 395.

Some years later the Court upheld, in a *per curiam* opinion, a state law that pro-

---

to 'content-neutral' time, place and manner regulations." 475 U.S. 41, 49, 106 S.Ct. 925, 929–30, 89 L.Ed.2d 29 (1986) (footnote omitted). After finding that the zoning restrictions placed on "adult" theaters in that case concerned "vital governmental interests," 475 U.S. at 50, 106 S.Ct. at 930, the Court stated that "[c]ities may regulate adult theaters by dispersing them, as in Detroit, or by effectively concentrating them, as in Renton.... '[T]he city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems.'" 475 U.S. at 52, 106 S.Ct. at 931 (quoting *Young v. American Mini Theatres,* 427 U.S. 50, 71, 96 S.Ct. 2440, 2453, 49 L.Ed.2d 310 (1976) (plurality opinion)). Even if we were to assume that some of the activities encompassed by the District C–X classification in the Kansas City zoning ordinance were entitled to some First Amendment protection, the ordinance is surely within the range of solutions we must give the city "a reasonable opportunity to experiment with."

**14.** To the extent that its laws do not conflict with those of the state of Missouri, Kansas City possesses all the powers that the state has the authority to confer. *See* Mo. Const. Art. VI, § 19(a); Kansas City, Mo., Charter § 1 (1986). "[The] state Liquor Control Act [of Missouri]

does not attempt to preclusively regulate but, on the contrary, specifically authorizes municipalities to enact ordinances, consistent with state law, regulating wholesalers and retailers of alcoholic beverages." *Passler v. Johnson,* 304 S.W.2d 903, 907 (Mo.1957). And, in fact, the Kansas City Charter authorizes the city "[t]o restrain, regulate or prohibit the manufacture, sale or giving away of any wines, intoxicating or malt liquors." Kansas City, Mo., Charter § 1(51). *See generally Chestnut Inn v. Johnson,* 297 S.W.2d 576 (Mo.Ct.App.1957) (sustaining order of Kansas City Liquor Control Board of Review, which suspended city permit to sell alcoholic beverages for ten days due to gambling on premises where alcohol was sold, in violation of city ordinance).

It is irrelevant that we deal here with the Plans and Zoning Committee of the City Council and with the Council itself rather than, say, a Liquor Licensing Board. It is the City Council that has the power to ban "exotic dancing" in bars, and the particular procedural devices or types of committees the Council employs to deal with such activities are of no constitutional significance.

**15.** It is also true, however, that the Kansas City ordinance only applies to live acts.

hibited not only the display of human genitals and anuses but also the display of any portion of a female breast below the areola in establishments where alcohol was consumed on the premises. *New York State Liquor Auth. v. Bellanca*, 452 U.S. 714, 714 n. 1, 715, 101 S.Ct. 2599, 2600 n. 1, 2600, 69 L.Ed.2d 357 (1981). Again, the Court relied on the state's regulatory dominion over the sale of alcohol: "The State's power to ban the sale of alcoholic beverages entirely includes the lesser power to ban the sale of liquor on premises where topless dancing occurs." 452 U.S. at 717, 101 S.Ct. at 2601.

These cases make clear that Kansas City could have altogether forbidden any number of activities from taking place in the Last Chance Lounge,[16] not the least of which is "exotic dancing" as defined in section 39.156 of the zoning ordinance. And as the greater power to ban the sale of alcoholic beverages includes the lesser power to regulate their sale, the greater power to totally prohibit exotic dancing in bars includes the lesser power to consider permitting such dancing in bars on a case-by-case basis.

■ Walker simply has no First Amendment right to display "go-go girls" in a drinking facility. His First Amendment rights cannot, therefore, have been violated by this zoning ordinance, and we thus reverse the decision of the District Court in favor of Walker on his First Amendment claim.[17]

The dissent, *post* at 98–99, suggests that our decision smacks of "judicial legislation." In our view, we would be guilty of "judicial legislation" if we were to uphold the District Court's First Amendment ruling striking down the challenged zoning ordinance when there has not been a clear showing of a constitutional violation. Here, we do just the opposite: we refuse to strike down the ordinance because it is apparent that what the city has done is well within the safe harbor afforded by the Twenty-first Amendment. In refusing to allow the city and its taxpayers to be held liable for a non-existent constitutional violation, we believe we are applying the law

---

16. *See, e.g., Chestnut Inn v. Johnson*, 297 S.W.2d 576 (Mo.Ct.App.1957).

17. The dissent argues that we are without authority to consider the State's power under the Twenty-first Amendment in this case because the city has relied on its authority to zone rather than its authority to regulate drinking establishments. In our view, however, to ignore the city's clear authority to prohibit exotic dancing in bars under the *LaRue* line of cases would be on the order of rejecting a search and seizure claim on grounds of reasonableness in a case in which the perpetrator was not a state actor. That the city presented us with a brief that could fairly be described as less than stellar and inexplicably ignored the *LaRue, Bellanca,* and *Iacobucci* cases does not relieve us of responsibility to announce the law, particularly where the issue itself—if not the dispositive case law—was, in fact, raised before the District Court and argued on appeal.

As this Circuit stated less than two years ago, "we have a responsibility to conform our decision to the law as we see it." *Pfoutz v. State Farm Mut. Auto. Ins. Co.*, 861 F.2d 527, 530 n. 3 (1988). In that case "the district court made no reference to Mo.Stat. § 307.010 and the parties did not raise the statutory provision prior to oral argument [where it was raised by the panel]" but the Court stated that nevertheless "we rely on [that] statute." Our rationale for decid-

ing that case on the basis of a statute cited by neither of the parties applies equally to the case before us today: "Our reliance on the Missouri motor vehicle statute raises no new issue in this case, but rather *suggests another theory to use in resolving the issues raised by the parties.*" *Id.* (emphasis added). We also stressed that the new theory injected into the case by the Court was, as here, of a legal rather than factual nature. *Id.* In our view, to ignore the Supreme Court's decisions in the *Larue* line of cases in the present case would amount to a denial of our responsibility to conform our decision to the law.

Moreover, to give such a narrow interpretation to the issues preserved for review in this case as to exclude discussion of the Twenty-first Amendment would be a great injustice to the people of Kansas City. Assuming the city would not prevail under the cases cited in its brief, we would be punishing the people of Kansas City because their attorneys failed to push the right buttons in a highly complex and shifting area of the law. Courts, including if not especially the Supreme Court, have decided cases on the basis of issues not raised in many contexts, but have been particularly prone to do so in this area of the law. *See FW/PBS, Inc. v. City of Dallas*, —— U.S. ——, 110 S.Ct. 596, 624, 107 L.Ed.2d 603 (1990) (Scalia, concurring in part, dissenting in part) (citations omitted); *see generally Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877–78, 49 L.Ed.2d 826 (1975).

rather than creating it and are adhering to the proper role of the judiciary in our country's system of government. As the city has not committed any violation of the Constitution, the relevant views as to the merits of coupling go-go dancing with the serving of alcohol in a public bar are not those of the judges on this particular panel, but those of the people of Kansas City as expressed through their chosen representatives—and, which were, incidentally, also expressed in this case by the people of the affected neighborhood themselves, with some fervor and regularity during the hearings on Walker's application. The view of the people of Kansas City, as reflected in the Council's action on Walker's application, is that Walker should not be permitted to display go-go girls in his bar, and we hold that the Constitution does not require otherwise.

### IV.

### A.

Walker also claims that defendants violated his rights to both procedural and substantive due process in the treatment of his application for rezoning. Procedural due process is based on the words of the Due Process Clause of the Fourteenth Amendment: "No State shall … deprive any person of life, liberty, or property, without due process of law." Walker therefore must assert a life, liberty, or property interest in obtaining the Council's permission to display go-go girls at the Last Chance Lounge. The source of "substantive due process" is somewhat more obscure, and the legitimacy of the doctrine has been long debated. *E.g., Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986); *Griswold v. Connecticut,* 381 U.S. 479, 508–10, 85 S.Ct. 1678, 1694–96, 14 L.Ed.2d 510 (1965) (Black, J., dissenting); *Dred Scott v. Sandford,* 60 U.S. (19 How.) 393, 620–26, 15 L.Ed. 691 (1857) (Curtis, J., dissenting). Unlike its eponym, substantive due process refers not to process at all, but to substantive rights. To make out a substantive due process claim, Walker

must show that the law violated one of his fundamental rights, which no amount of process could repair. We say this not to be gratuitously pedagogic, but because it is not entirely clear which due process arguments Walker made in the District Court and consequently which arguments are properly before us for review.

In his memorandum in support of his motion for a preliminary injunction and his application for a temporary restraining order, Walker stated that he was making a procedural due process claim based on a liberty interest in displaying go-go girls at the Last Chance Lounge. His description of the state action as "the City Council's enactment of Zoning Ordinance Section 39.-156," [18] however, makes sense only as part of a substantive due process claim. The District Court described Walker's claim as resting on a property-based procedural due process right, but employed substantive due process cases in its analysis. On appeal, Walker asserts a procedural due process right grounded on a liberty interest as well as a substantive due process right. If a recitation of the due process arguments that have been raised and discussed thus far in this case were a statute it would be void for vagueness.

While we are loath to review a claim that appears not to have been preserved for appeal, it is unclear to us which claims have and which have not been so preserved. And in this case we are even more loath to fashion a procedural bar to a review of the merits for fear of inducing yet more litigation of this matter. Moreover, unlike any decision we may make regarding which of the various due process claims have, in fact, been preserved for review, the merits of the case are clear: under no theory of either procedural or substantive due process is Walker entitled to relief. We will consider in turn each due process claim arguably raised in the proceedings below.

### B.

■ Assuming Walker adequately pleaded a procedural due process right grounded

---

18. Plaintiff's Memorandum in Support at 18.

in both liberty and property interests, as well as a substantive due process right to display go-go girls at his bar, his claim fails. The strongest of his due process theories is that which the District Court supposed him to have made, and which the court properly rejected: a procedural due process right based on a property interest in having the City Council approve his application for rezoning.

Before due process protections will attach, Walker "clearly must have more than an abstract need or desire for [receiving the benefit]. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Nothing in the Kansas City ordinance entitled Walker to believe that the City Council would—much less must—approve his application.

The zoning ordinance establishes various hoops an applicant for C–X zoning must jump through to be minimally eligible for the zoning change, but leaves entirely to the discretion of the City Council the determination to grant or deny the proposed rezoning. The only guidepost available to the City Council in making this decision is found in the opening statement of the "Purpose" section of the zoning ordinance, which reads: "In the interpretation and application of the provisions of this Chapter, such provisions shall be held to be the minimum requirements adopted for the promotion of the health, safety, morals, or the general welfare of the community." Kansas City, Mo., Zoning Ordinance § 39.340 (1987). Taking this statement to be more precept than shibboleth, it still places loose reins on the Council's discre-

tion—far looser reins than even those state regulations that the Supreme Court has held to lack the requisite "substantive limitations" necessary to call the Due Process Clause into play. "[R]egulations [that] place no substantive limitations on official discretion ... create no ... interest entitled to protection under the Due Process Clause." *Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983). An evaluation of whether granting a particular rezoning application request would advance, for example, "the general welfare of the community" is, at its most concrete, "subtle and depend[ant] on an amalgam of elements, some of which are factual but many of which are purely subjective appraisals." *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 9–10, 99 S.Ct. 2100, 2105, 60 L.Ed.2d 668 (1979).[19] And there are absolutely no standards, guidelines, or procedures to aid the Council in deciding whether to grant an application for C–X zoning.[20]

Precisely because the zoning ordinance "place[s] no substantive limitations on official discretion," *Olim*, 461 U.S. at 249, 103 S.Ct. at 1747, it does not obligate the City Council, as a constitutional matter, to afford Walker any particular process: nothing could be shown that would compel the City Council to grant an application for C–X zoning. If the zoning ordinance so limited the discretion of the City Council that a constitutionally protected property interest were created, then holding hearings ad infinitum without ever calling Walker's application to a vote might violate the due process requirement that the hearing be held "at a meaningful time and in a meaningful manner." *Armstrong v. Man-*

---

**19.** Although both *Greenholtz* and *Olim* concerned liberty rather than property interests, the Court has not distinguished between these interests in applying the principle that a certain degree of discretion in the hands of the decisionmaker must defeat claims to due process. *See, e.g., Board of Pardons v. Allen*, 482 U.S. 369, 381–85, 107 S.Ct. 2415, 2422–25, 96 L.Ed.2d 303 (1987) (O'Connor, J., dissenting); *United States v. Von Neumann*, 474 U.S. 242, 252, 106 S.Ct. 610, 616, 88 L.Ed.2d 587 (1986) (Burger, C.J., concurring in part); *Bishop v. Wood*, 426 U.S. 341, 356 n. 1, 96 S.Ct. 2074, 2083 n. 1, 48

L.Ed.2d 684 (1976) (White, J., dissenting); *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699–700, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth*, 408 U.S. 564, 578, 92 S.Ct. 2701, 2709–10, 33 L.Ed.2d 548 (1972).

**20.** *Cf. Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 466, 101 S.Ct. 2460, 2465, 69 L.Ed.2d 158 (1981) ("The ... statute, having no definitions, no criteria, and no mandated 'shalls,' creates no analogous duty or constitutional entitlement.").

*zo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). But the ordinance, far from so limiting the Council, leaves it with unfettered discretion. Although the ordinance provides for a hearing on applications for C–X zoning, there can be no due process right to an expeditious disposition of the subject matter of a hearing that is held as a matter of grace, rather than as a matter of constitutional requirement. It is the very discretion Walker complains of that defeats his due process claim based on an asserted property interest in C–X zoning. We therefore affirm the District Court's rejection of this claim.

■ Walker's other procedural due process claim—that he had a "liberty" interest in establishing go-go girls at the Last Chance Lounge—also lacks merit. Walker contends that because his desire to display almost-nude dancing girls in his bar constituted an attempt to exercise his constitutionally protected right of free speech, any limitation Kansas City placed on his ability to so proceed encroached on his liberty, thereby calling the Due Process Clause into play. We disagree. This sort of peep-show entertainment would not rise to the level of a liberty interest when presented in a drinking establishment even if we accepted Walker's interpretation of the First Amendment. For the reasons stated in Part III of this opinion, Walker's conception of the constitutional status of go-go girls runs headlong into the state's power under the Twenty-first Amendment to trump Walker's hypothetical First Amendment rights. Kansas City would have acted within constitutional bounds had it banned go-go dancing outright in establishments licensed to sell liquor by the drink. Walker, therefore, has no protected liberty interest in gaining permission to display go-go girls at the Last Chance Lounge and he was due no constitutionally mandated process in the City Council's consideration of his application.

## C.

■ Nor does Walker's interest in go-go girls attain the rank of a "substantive due process right." Although "emanations" from the "penumbras" of the Bill of Rights have been found to protect an expansive array of activities not obvious to the casual reader of the Constitution,[21] we can find no "emanation" that would encompass the right to have go-go girls perform in one's bar. The "substantive due process" mantra (or some variation on the theme of constitutional rights that do not owe their existence to any particular language in the text of the Constitution) has been invoked to shelter fundamental individual rights from governmental interference in the areas of child rearing and education,[22] family relationships,[23] procreation,[24] and marriage.[25] It is difficult to imagine an interest more directly at antipodes from these interests than that asserted by Walker in this case.[26] Indeed, the "teachings of history" and the "basic values ... under[lying] our society" that have

**21.** *See Griswold v. Connecticut*, 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965).

**22.** *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (finding compulsory public education for children an encroachment on the fundamental right of parents to direct the education of their children); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (state statute prohibiting the teaching of any modern language except English in elementary schools violates same fundamental right).

**23.** *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (right to live with one's grandmother violated by city housing ordinance limiting residents of single dwelling unit to members of immediate family); *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (recognizing a right in the parent or guardian of a child to control the child's religious education).

**24.** *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (holding that a woman has a right to abort her fetus in some circumstances); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (state law forbidding the sale of contraceptives to married couples violates the right to marital privacy).

**25.** *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (holding anti-miscegenation laws a violation of the Due Process Clause).

**26.** *Cf. Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986).

informed the Court's discovery of "substantive due process" rights [27] militate rather strongly against a fundamental right to promote the entertainment envisioned by Walker.[28]

To examine the most expansive expositions on the idea that the Due Process Clause protects fundamental freedoms that are not specified in the Constitution is to demonstrate forcefully that no "substantive due process" right is to be found in the display of go-go girls in a bar.

> [T]hrough the course of this Court's decisions [due process] has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society.... The balance of which I speak is the balance struck by this country, having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke.

*Poe v. Ullman,* 367 U.S. 497, 542, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting).

> [Liberty] denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men.

*Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). Walker's desire to engage go-go girls at the Last Chance Lounge is not one of "those privileges long recognized ... as essential to the orderly pursuit of happiness by free men." [29] It therefore is not protected by substantive due process.

## V.

We hold that the Kansas City zoning ordinance challenged here is well within constitutional bounds. Because of the state's broad powers under the Twenty-first Amendment, Walker's First Amendment right to display go-go dancers in his bar, assuming *arguendo* the existence of such a right, has not been violated. We therefore reverse the District Court's judgment for Walker on his First Amendment claim. The District Court's injunction against the application of the ordinance to Walker and its award of nominal damages and attorney fees are, therefore, vacated. Our reversal of the judgment for Walker on his First Amendment claim moots his claim for compensatory damages and makes it unnecessary for us to reach the issues raised by Walker concerning the District Court's denial of compensatory damages. In all other respects, the challenged rulings of the District Court, including its rejection of Walker's due process claims, are affirmed.

Affirmed in part and reversed in part.

DUMBAULD, Senior District Judge, concurring.

> Our prior decisions recognizing a right to privacy guaranteed by the Fourteenth Amendment included "only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty.' ..."
> Nothing, however, in this Court's decisions intimates that there is any "fundamental" privacy right "implicit in the concept of ordered liberty" to watch obscene movies in places of public accommodation.
> *Paris Adult Theatre I v. Slaton,* 413 U.S. 49 at 65–66, 93 S.Ct. 2628 at 2639–40 (1972) (citations omitted).

27. *Griswold,* 381 U.S. at 501, 85 S.Ct. at 1754 (Harlan, J., concurring).

28. *Cf.* Model Penal Code § 213.5 comment.
 Exposure of one's private parts to public view constituted a common-law misdemeanor.... The proscribed conduct [in modern state statutes] usually focuses upon exposure of one's private or intimate parts, although a number of recent revisions more narrowly prohibit display of a "sex organ" or of other specifically named areas of the body.
 *Id.* at 406 & 409 (footnotes omitted).

29. Faced with a claim similar to Walker's, the Supreme Court has written:

Since the panel is unable to join in a unanimous opinion, it may be helpful if I state my own views respecting how I regard the issues involved.

The case at bar is essentially a zoning or land use case. Appellant seeks to change the existing use at the location of his establishment from a bar *simpliciter*, selling liquor by the glass for consumption on the premises, to an establishment so selling liquor *plus* providing go-go dancing. This automatically thereupon becomes a case subject to regulation by the city's zoning authority under its broader powers conferred by the Twenty-first Amendment.

That is true whether counsel talks about the Twenty-first Amendment or not. Naturally he will talk more about the new feature being added (just as a car salesman will stress the new anti-locking brakes rather than the time-tested rugged engine) but, *ex necessitate rei* the force of the Twenty-first Amendment necessarily comes into the picture.

I am satisfied that, as stated above, the facts of the case automatically invoke application of the Twenty-first Amendment. As the old maxim says, the law arises from the facts—*ex facto oritur jus.*

The facts of the case show that the setting and environment involve not the abstract issue whether dancing is speech, but whether in a barroom setting the City possesses broadened[1] regulatory authority to act against the evils consequent upon such a situation. These are substantial evils, arising from the synergistic impact of nudi-

ty and liquor together. They are colorfully described by Chief Judge Rehnquist in his opinion for the Court in *Larue*.[2]

This case on its plain facts involves not a ballet in a theatre but in the context of a barroom environment with interaction between the dancers and customers,[3] and the City does have adequate regulatory power under *Larue* and also under *New York State Liquor Authority v. Bellanca*, 452 U.S. 714, 715, 101 S.Ct. 2599, 2600, 69 L.Ed.2d 357 (1986).[4] These authorities are adequate, in my view, to support our decision.

Hence, in the case at bar I think we cannot escape the force of an Amendment to the Constitution. It is a part of the Supreme Law and we must apply it. So I am agreeable to relying on the Twenty-first Amendment as our *ratio decidendi*.[5]

Judge Bowman's opinion, as I interpret it, firmly rests the decision on these authorities. He also in note 13 cites the cases permitting zoning (either by concentration or dispersion) of "adult" entertainment as a proper method of allocating land use. The Supreme Court thus recognized First Amendment concerns as not necessarily controlling but simply one peripheral element to be considered in the balancing decisions regarding the appropriate use of a particular tract.

I therefore concur in Part III of his opinion,[6] and in the judgment of reversal in part, and affirmance in part.

1. It was pointed out in *California v. LaRue*, 409 U.S. 109, 114, 93 S.Ct. 390, 395, 34 L.Ed.2d 342 (1972), that "the broad sweep of the Twenty-First Amendment has been recognized as conferring something more than the normal state authority over public health, welfare and morals [traditionally within the scope of the police power]."

2. 409 U.S. at 111, 93 S.Ct. at 393.

3. *See* 409 U.S. at 114, 93 S.Ct. at 395.

4. It is well established "that a State has broad powers under the Twenty-first Amendment to regulate the times, places *and circumstances* under which liquor may be sold." [Italics supplied].

5. *See also Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877–78, 49 L.Ed.2d 826 (1976); and *FW/PBS, Inc. v. City of Dallas,* — U.S. —, 110 S.Ct. 596, 624, 107 L.Ed.2d 603 (Scalia, J).

6. With respect, I regard part II as massive *obiter dictum*, or in his own pithy phrase "gratuitously pedagogic." To a lesser degree, the same is true of part IV. I view the invocation of due process by appellant as merely a vehicle for making the First Amendment applicable to local governments under the doctrine of "selective incorporation." No substantial claim is presented of delay amounting to denial of justice in the sense of article 40 of Magna Carta. *See* J.C. Holt, *Magna Carta* (1965) 326–27.

LAY, Chief Judge, dissenting.

I respectfully dissent. In my view, the majority improperly reaches issues not raised by the parties, and then erroneously resolves those issues.

The only issue raised by the City on cross-appeal is whether the district court applied the proper standard of review to the City Council's actions. The City did not, in either the district court or in this court, challenge the first amendment status of Walker's proposed entertainment.[1] The primary difficulty I have with the majority's opinion is that it fails to decide the issues before us and then reaches out to decide issues that were not briefed or argued to this court. The opinion in Section II discusses in ten pages why the Kansas City ordinance as applied to go-go dancing should not deserve first amendment protection. It concludes, however, that it is not necessary to decide the case on this basis because the City was within its authority to deny Walker's application under the 21st amendment.[2] Not only is the discussion on the first amendment advisory and pure dicta, it is also clearly wrong.

First, the majority relies on dicta from the Supreme Court to suggest that nude dancing is not protected by the first amendment. I suggest this dicta is no more persuasive than the Supreme Court's statement in *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), which the majority dismisses as "unadulterated dicta." Second, I

believe the *Schad* dicta is stronger and more persuasive than the majority recognizes. The Court began its analysis in *Schad* by noting: "Here the Borough totally excludes all live entertainment, *including non-obscene nude dancing that is otherwise protected by the First Amendment.*" 452 U.S. at 76, 101 S.Ct. at 2186 (emphasis added). Third, *City of Dallas v. Stanglin,* 490 U.S. 19, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989), does not apply to this case since it is not a free speech case, but a freedom of association claim. Finally, no other circuit court of which I am aware has deprived entertainment businesses of first amendment protection for dancing.[3] The en banc Seventh Circuit has recently passed on this issue, and until there is authority to the contrary, it seems to me the Seventh Circuit's opinion should be followed. *See Miller v. Civil City of South Bend,* 904 F.2d 1081 (7th Cir.1990).

However, my judicial concern relates to the majority's holding that the land use ordinance, which the district court found unconstitutional under rules of prior restraint, may be upheld under the 21st amendment.[4] This will be startling news to the City as well as to Walker since this issue was never raised before the City Council, or factually discussed by Council members, or asserted in the district court, or briefed or argued by the parties in this court. The records of the City Council proceedings do not contain one word or reference to liquor regulation or the authority of the City to deny Walker's permit

1. To the contrary, before this court, the City appears to concede the first amendment status of Walker's proposed entertainment: "The City Council is not required to suspend its role in land use planning while considering a proposal to rezone an area adjacent to an extensively used park *even though the proposal involves expression that is protected by the First Amendment.*" Appellee's Br. p. 40 (emphasis added); *see also id.* p. 36 ("constitutionally protected form of expression"). This concession is arguably an even stronger justification for not reaching the first amendment issue than is the failure to raise the issue.

2. I find surprising the majority's reasoning for not reaching the first amendment issue: "Walker has suggested no theory under which we could find his go-go girls expressive of some-

thing protected by the first amendment." Maj. op. at 90. Walker logically suggested no "theory" since he assumed, as did the City, that the first amendment status of the proposed entertainment was not at issue.

3. *See, e.g., BSA, Inc. v. King County,* 804 F.2d 1104, 1107 (9th Cir.1986) (recognizing first amendment status of barroom nude dancing); *International Food & Beverage Sys. v. City of Fort Lauderdale,* 794 F.2d 1520, 1525 (11th Cir. 1986) (same); *Leverett v. City of Pinellas Park,* 775 F.2d 1536, 1540 (11th Cir.1985) (same).

4. The 21st amendment reserves for the states the authority to regulate "[t]he transportation or importation into any state * * * for delivery or use * * * intoxicating liquors." U.S. Const., Amend. 21.

because the proposed entertainment was to take place in a facility serving liquor. The City Council's failure to consider this authority is not surprising because this case does not relate to the regulation of liquor, but is a zoning case relating to land use.[5]

It is popular these days to urge that appointed judges should not engage in "judicial legislation." I am not sure what that phrase means but it has always been popular to assert that judges should not make the law, but should simply interpret it. This aphorism overlooks the very nature of judicial work in that when judges decide cases they do make law. I assume that those who urge that judges should not legislate really mean that judges should not engage in policymaking decisions as legislatures and city councils have the power to do or inject their own personal views as legal doctrine.[6] The criticism directed towards judges legislating is seldom justified as it overlooks five fundamental differences between judicial review and legislation.

First, judges are required to review cases only under the grant of authority provided by the Constitution or legislation. Second, judges do not decide hypothetical or advisory cases, but must confine themselves to actual or real controversies between parties who have standing or an interest in the litigation. Third, judges are confined to the factual record before them. Fourth, on appeal, judges will review only those issues that are decided in the district court and that are briefed and argued on appeal. Fifth, the very essence of judicial duty is to avoid deciding constitutional questions unless absolutely necessary.

I respectfully submit that the majority opinion offends these basic canons governing judicial review. I therefore dissent.

---

**5.** Even if I could agree that this issue was properly raised for our consideration, I have doubts about the majority's resolution of the issue. I recognize that states possess authority to regulate liquor sales and distribution. *See, e.g., New York Liquor Auth. v. Bellanca,* 452 U.S. 714, 101 S.Ct. 2599, 69 L.Ed.2d 357 (1981); *California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972). The majority's application of the 21st amendment in this case, however, when the City is not even attempting to regulate liquor, expands the 21st amendment far beyond the scope of the authority that the Supreme Court has recognized. I therefore find the majority's representation that this case is "remarkably similar" to the Supreme Court's precedents on this subject, maj. op. at 91, unbelievable. Cases such as *Bellanca, LaRue,* and *Lanier v. City of Newton, Ala.,* 842 F.2d 253 (11th Cir.1988) illustrate the context in which 21st amendment authority should be upheld: Where the regulatory authority finds that the combination of liquor and certain forms of entertainment leads to conduct deemed undesirable. *See Bellanca,* 452 U.S. at 718, 101 S.Ct. at 2601–02 (city chooses to avoid disturbances associated with mixing alcohol and nude entertainment); *LaRue,* 409 U.S. at 111, 93 S.Ct. at 393 (evidence established incidents of prostitution, rape, and assault occurring in or near bars offering nude entertainment); *Lanier,* 842 F.2d at 255 (town council found nudity and alcohol led to undesirable behavior). The City Council in this case was not even remotely concerned with regulating liquor. In this context, I find persuasive the reasoning of *Southern Enter-*

*tainment Co. of Fla., Inc. v. City of Boynton Beach,* 736 F.Supp. 1094 (S.D.Fla.1990), in which the court pointed out the 21st amendment is applicable only where the sale of liquor in conjunction with nudity is regulated rather than simply regulating the nudity. Here, the City Council did not express any attempt to regulate liquor, or identify any possible alleged evils associated with the combination of liquor and nudity. The City Council's action was simply a reaction to the proposed nudity. Although the Supreme Court has not adopted this reasoning, it has recognized that the states' 21st amendment authority is not without limits. *See, e.g.; City of Newport, Ky. v. Iacobucci,* 479 U.S. 92, 94–95, 107 S.Ct. 383, 384–85, 93 L.Ed.2d 334 (1986); *id.* at n. 5.

**6.** The majority, in its dicta discussion of the first amendment, portrays a personal distaste for Walker's proposed go-go dancing. This calls to mind the following verse:

His good has no nuances. He
Doubts or believes with total passion.
Heretics choose for heresy
Whatever's the prevailing fashion.
Those wearing tolerance for a label
Call other views intolerable.

Phyllis McGinley, *In Praise of Diversity* (reprinted in Kuh, Foolish Figleaves? Pornography in—and out of—Court at 175 (1967); *see also Miller,* No. 88–3006/3244 (Posner, J., concurring) (giving first amendment protection to nude dancing strikes judges as ridiculous due in part to personal beliefs.)